2001 ND 125

Colleen ANDERSON, Plaintiff
and Appellant,

v.

MEYER BROADCASTING COMPANY,
Defendant and Appellee.

No. 20000322.

Supreme Court of North Dakota.

July 10, 2001.

Lee J. Balerud, Minot, ND, for plaintiff and appellant.

Jerome C. Kettleson, Pearce & Durick, Bismarck, ND, for defendant and appellee.

SANDSTROM, Justice.

[¶ 1] Colleen Anderson has appealed from a summary judgment dismissing her claims against Meyer Broadcasting Company ("Meyer") for age discrimination, sex or gender discrimination, retaliatory discharge, defamation, and breach of contract. We affirm, concluding Anderson failed to raise genuine issues of material facts on required elements of her claims.

I

[¶ 2] Meyer owned a statewide network of television and radio stations. In 1985, Anderson began working in the sales department at Meyer's Minot television station, KMOT. In March 1995 Anderson was promoted to general manager of KMOT, replacing a person ("the Fargo manager") who had transferred to Meyer's Fargo television station, KVLY.

[¶ 3] After taking over as general manager at KMOT, Anderson discovered financial improprieties from prior years. In January 1996 Anderson reported these alleged improprieties and provided supporting documentation to Meyer's comptroller. The comptroller reported the matter to a Meyer vice president, who reviewed the material and decided no further action was needed.

[¶ 4] In June 1996 an employee at KVLY told Anderson during a telephone call that she had seen the Fargo manager and a female employee engaging in inappropriate sexual contact in a hallway at KVLY. Anderson reported the incident to the vice president and general manager of Meyer ("general manager"), who investigated the incident but took no formal action.

[¶ 5] In the summer of 1997, concerned that no action had been taken on the alleged financial improprieties, Anderson reported the suspected embezzlement to the general manager, who initiated an investigation.

[¶ 6] In August 1997 a position opened at KVLY for a general sales manager. The Fargo manager was responsible for the hiring. Anderson applied for the position, but was not hired. In September 1997 the Fargo manager hired the woman with whom he had been accused of engaging in sexual contact in the office.

[¶ 7] In late 1997, the investigation into the Fargo manager's alleged misappropriation of funds while he was at KMOT was completed, and he was asked to resign.

[¶ 8] In early 1998, the general manager announced that he was retiring. Anderson and Penny Borg, the general sales manager for Meyer's western North Dakota television stations, were asked to apply for the general manager's position by Meyer's chief executive officer and president ("the president"). The president, after interviewing Anderson and Borg and consulting with the general manager, ultimately decided to hire Borg. When the general manager retired on June 1, 1998, Borg became Meyer's general manager and Anderson's immediate supervisor.

[¶ 9] In late June a dispute arose between Borg and Anderson over Borg speaking directly with other KMOT employees rather than coordinating communications through Anderson. Borg and Anderson discussed the matter in a June

26, 1998, telephone call. The parties' recollection of the conversation is similar, and they do not dispute the nature or content of the call. During the conversation, Anderson said to Borg, among other things:

"You think I'm going to trust you after that move?"

"I operate by this: 'Fair-fair/unfair-unfair. You set the pace because you're my boss.' In other words, if you're fair with me, I'll be very fair back; however, if you're unfair, I'll jack you around as well."

"Fire me, but know this, I won't go easy."

[¶ 10] After the June 26 telephone conversation, Borg learned that Anderson had sent information to representatives of Sunrise Television, which was in the process of purchasing Meyer. Meyer claims Anderson and other management had been told all communications with Sunrise were to be handled through the Bismarck office and they were not to provide information directly to Sunrise. Anderson disputes she was ever informed of that directive.

[¶ 11] On June 30, 1998, Borg fired Anderson. The reasons given by Meyer for termination were that Anderson had been insubordinate and had provided information directly to Sunrise after having been told not to do so.

[¶ 12] Anderson sued Meyer for age discrimination, sex or gender discrimination, retaliatory discharge, defamation, and breach of contract. Following extensive discovery, Meyer moved for summary judgment. The district court granted summary judgment and dismissed all of Anderson's claims. Anderson has appealed.

[¶ 13] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 28–27–01. The appeal was timely under N.D.R.App.P. 4(a).

## II

 [¶ 14] We consider the merits of Anderson's appeal in the posture of summary judgment. Summary judgment is a procedural device for promptly and expeditiously disposing of an action without a trial if either party is entitled to a judgment as a matter of law and if no dispute exists as to either the material facts or the reasonable inferences to be drawn from undisputed facts, or resolving the factual disputes will not alter the result. *E.g.*, *Van Valkenburg v. Paracelsus Healthcare Corp.*, 2000 ND 38, ¶ 17, 606 N.W.2d 908. We have outlined the duty of a party opposing a summary judgment motion:

Although the party seeking summary judgment has the burden of showing that there is no genuine issue of material fact, the party resisting the motion may not simply rely upon the pleadings. Nor may the opposing party rely upon unsupported, conclusory allegations. The resisting party must present competent admissible evidence by affidavit or other comparable means which raises an issue of material fact and must, if appropriate, draw the court's attention to relevant evidence in the record by setting out the page and line in depositions or other comparable documents containing testimony or evidence raising an issue of material fact.

In summary judgment proceedings, neither the trial court nor the appellate court has any obligation, duty, or responsibility to search the record for evidence opposing the motion for summary judgment. The opposing party must also explain the connection between the factual assertions and the legal theories

in the case, and cannot leave to the court the chore of divining what facts are relevant or why facts are relevant, let alone material, to the claim for relief.

*Peterson v. Zerr,* 477 N.W.2d 230, 234 (N.D.1991) (citations omitted), *quoted in Barnes v. St. Joseph's Hosp.,* 1999 ND 204, ¶ 9, 601 N.W.2d 587, and *Strom–Sell v. Council for Concerned Citizens, Inc.,* 1999 ND 132, ¶ 16, 597 N.W.2d 414.

[¶ 15] Summary judgment is appropriate against a party who fails to establish the existence of a factual dispute on an essential element of her claim and on which she will bear the burden of proof at trial. *Dahlberg v. Lutheran Soc. Servs. of N.D.,* 2001 ND 73, ¶¶ 11, 42, 625 N.W.2d 241; *Van Valkenburg,* 2000 ND 38, ¶ 25, 606 N.W.2d 908; *Black v. Abex Corp.,* 1999 ND 236, ¶ 23, 603 N.W.2d 182; *Barnes,* 1999 ND 204, ¶ 9, 601 N.W.2d 587. When no pertinent evidence on an essential element is presented to the trial court in resistance to summary judgment, it is presumed no such evidence exists. *Van Valkenburg,* at ¶ 27; *Miller v. Medcenter One,* 1997 ND 231, ¶ 15, 571 N.W.2d 358.

### III

[¶ 16] Anderson argues the trial court erred in dismissing her age discrimination claim under the North Dakota Human Rights Act, N.D.C.C. ch. 14–02.4.

[¶ 17] The Human Rights Act outlines numerous exceptions to the employment-at-will doctrine. *Hougum v. Valley Mem'l Homes,* 1998 ND 24, ¶ 35, 574 N.W.2d 812. The Act's purpose is to prevent and eliminate discrimination in employment relations, and it prohibits an employer from taking certain adverse employment actions on the basis of, among other things, age or gender. *See* N.D.C.C. §§ 14–02.4–01, 14–02.4–03; *Hougum,* at ¶ 35. In the context of this case, the Act prohibits an employer from according ad-

verse or unequal treatment with respect to promotion on the basis of age. N.D.C.C. § 14–02.4–03. For purposes of the Act, "age" is defined in N.D.C.C. § 14–02.4–02(1):

> "Age" insofar as it refers to any prohibited unfair employment or other practice means at least forty years of age.

[¶ 18] The plaintiff in a discrimination action under the Human Rights Act must carry the initial burden of establishing a prima facie case. *Opp v. Source One Mgmt., Inc.,* 1999 ND 52, ¶ 14, 591 N.W.2d 101; *Schweigert v. Provident Life Ins. Co.,* 503 N.W.2d 225, 227 (N.D. 1993). To establish a prima facie case of discrimination under the Human Rights Act, the plaintiff must prove: (1) she was a member of a protected class under the Act; (2) she was satisfactorily performing the duties of her position; (3) she suffered an adverse employment decision; and (4) others not in the protected class were treated more favorably. *See Miller,* 1997 ND 231, ¶¶ 13–14, 571 N.W.2d 358; *Schuhmacher v. North Dakota Hosp. Ass'n,* 528 N.W.2d 374, 378 (N.D.1995); *Schweigert,* 503 N.W.2d at 227 n. 2. Thus, in order to show a prima facie case of age discrimination, Anderson must show she is a member of the protected class (at least forty years old), *see* N.D.C.C. § 14–02.4–02(1), and others not in the protected class (under forty) were treated more favorably.

[¶ 19] The basis for Anderson's age discrimination claim is her allegation she was passed over for promotions in favor of younger employees. Anderson failed to direct the court's attention to any evidence to show that she is at least forty years of age or that the people promoted to the positions she sought were younger than forty. When no evidence on an essential element is presented to the trial court in resistance to summary judgment,

it is presumed no such evidence exists. *Van Valkenburg*, 2000 ND 38, ¶ 27, 606 N.W.2d 908; *Miller*, 1997 ND 231, ¶ 15, 571 N.W.2d 358. Because Anderson failed to direct the court's attention to any evidence showing that she was a member of the protected class or that the other employees treated more favorably were not members of the protected class, summary judgment dismissal of her age discrimination claim was not error.

IV

[¶ 20] Anderson argues the trial court erred in dismissing her sex or gender discrimination claims under the Human Rights Act.

A

▬ [¶ 21] Anderson's gender discrimination claims under the Human Rights Act are based upon her allegation that a male employee who was terminated was treated differently from Anderson when she was terminated. As previously noted, a plaintiff alleging discrimination under the Human Rights Act has the burden of initially establishing a prima facie case. *Opp*, 1999 ND 52, ¶ 14, 591 N.W.2d 101; *Schweigert*, 503 N.W.2d at 227. Thus, in a gender discrimination case, the plaintiff must prove she is a member of a protected class and others not in the protected class were treated more favorably. *Miller*, 1997 ND 231, ¶¶ 13–14, 571 N.W.2d 358.

▬ [¶ 22] Anderson argues the disparate manner in which Meyer handled the investigation and termination of the Fargo manager and her own termination demonstrates that Meyer unfairly discriminated against women under the Human Rights Act. In support of her allegation, Anderson points to the lengthy investigation before the Fargo manager was terminated, compared with her summary dismissal within days of the alleged insubordination during the June 26, 1998, telephone call. In making a prima facie case of disparate treatment discrimination, "the plaintiff 'must identify and relate specific instances where persons situated similarly *in all relevant aspects* were treated differently.'" *Miller*, 1997 ND 231, ¶ 16, 571 N.W.2d 358 (quoting *Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir.1997)) (emphasis added). It can hardly be said that the situations involving the Fargo manager's and Anderson's respective dismissals were similar "in all relevant aspects." The complaints lodged against the Fargo manager were brought by other employees. In such circumstances, the employer will ordinarily conduct a thorough investigation, often as in this case questioning many employees, to establish the truth of the matter. Conversely, when an employee is directly insubordinate to her supervisor, as is alleged in this case, the employer may decide no further investigation is necessary.

[¶ 23] Anderson cites a single example to support her disparate impact claim, and the circumstances are so dissimilar they provide no inference that Meyer treated its male employees more favorably than its female employees. Accordingly, Anderson has failed to establish a genuine issue of material fact on an essential element of her claim, and the trial court did not err in granting summary judgment dismissing her disparate impact claim.

B

▬ [¶ 24] Anderson also alleges sex discrimination under the Human Rights Act, based upon her allegation she was turned down for two promotions in favor of other women who were having sexual relationships with Meyer employees involved

in the promotion decisions. Anderson alleges this conduct constitutes sexual harassment and is actionable discrimination under the Human Rights Act.

[¶ 25] Anderson has not provided a cogent analysis of her precise theory on this issue, nor has she cited any relevant authority. Anderson does not allege quid pro quo discrimination. She does not claim she was expressly or impliedly invited to participate in sexual activity in order to obtain favorable treatment. She does not claim she was the direct victim of inappropriate sexual conduct, nor does she argue there was "hostile work environment" sexual discrimination.

[¶ 26] Anderson's sole claim is that she was not promoted and the two women who were promoted were engaged in some form of sexual relationship with male employees involved in the hiring decisions. Although Anderson repeatedly labels these as "inappropriate" sexual relationships, there is no evidence in this record that the relationships, if any, were anything but consensual. Anderson does not cite a single case from any jurisdiction, or any secondary authority, holding such conduct is actionable sex discrimination. Nor does Anderson provide any supportive reasoning or public policy rationale for extending the Human Rights Act to such conduct. On the record in this case, we conclude the trial court did not err in dismissing Anderson's sex discrimination claims.

V

[¶ 27] Anderson argues the trial court erred in dismissing her retaliatory discharge claim. In her complaint, Anderson alleged she was discharged in retaliation for her reporting of "certain illegal acts," including the alleged embezzlement by the Fargo manager and discrimination against other female employees of Meyer.

[¶ 28] Although employment without a definite term is presumed to be at will, giving the employer the right to terminate an employee at any time with or without cause, there are exceptions to the at-will doctrine. *Jose v. Norwest Bank North Dakota, N.A.,* 1999 ND 175, ¶ 17, 599 N.W.2d 293; *Ressler v. Humane Soc. of Grand Forks,* 480 N.W.2d 429, 431 (N.D.1992); *see* N.D.C.C. § 34–03–01. We have recognized limited public policy exceptions to the at-will rule if employees establish they were terminated in retaliation for complying with a clear public policy. *Dahlberg,* 2001 ND 73, ¶ 32, 625 N.W.2d 241; *Jose,* at ¶ 17. Furthermore, N.D.C.C. § 34–01–20(1) specifically provides "[a]n employer may not discharge ... an employee ... because ... [t]he employee ... in good faith, reports a violation or suspected violation of federal or state law or rule to an employer." Anderson did not cite this statute in support of her retaliatory discharge claim.

[¶ 29] Under either the public policy exception or the statutory exception in N.D.C.C. § 34–01–20(1), in order to establish a prima facie case of retaliatory discharge, the employee bears the burden of showing: (1) the employee engaged in protected activity; (2) the employer took adverse action against the employee; and (3) the existence of a causal connection between the employee's protected activity and the employer's adverse action. *Dahlberg,* 2001 ND 73, ¶ 34, 625 N.W.2d 241; *Opp,* 1999 ND 52, ¶ 23, 591 N.W.2d 101. The essential element missing in this case is any evidence of a causal connection between the protected activity (Anderson's reporting of the suspected embezzlement and inappropriate sexual conduct in the Fargo office) and Meyer's adverse action (termination). In the "retaliatory conduct" claim in her complaint, the only adverse action pleaded by Anderson is her termi-

nation. She did not allege she was denied promotions in retaliation for her protected activities.

[¶ 30] Anderson alleges that shortly after firing Anderson, Borg telephoned another Meyer employee, Debbie Burton, to tell her Anderson had been fired. Anderson's brief alleges: "In fact Debbie Burton testified that Penny Borg told her that the alleged insubordination supposedly occurring June 26, 1998 was not why Colleen was fired and that her termination had been a long time coming." However, Burton's deposition testimony cited by Anderson to support that allegation does not contain any evidence that Borg told Burton insubordination was not the reason Anderson was fired. Rather, Burton testified only that Borg did not use the specific word "insubordination," and that Borg said words to the effect that Anderson's firing "has been coming." Anderson's brief wholly mischaracterizes Burton's testimony.[1] There is no evidence in the record that Borg told Burton the alleged insubordination was not the reason Anderson was fired.

[¶ 31] Anderson argues a causal connection between her protected activities and her termination can be inferred from the circumstances in this case, as in *Ressler*. She agues *Ressler* is "directly on point" with this case.

[¶ 32] *Ressler* is hardly "directly on point." In *Ressler*, Humane Society employee Daria Ressler had examined a dog that was suspected of being abused. Her investigation revealed no signs of abuse. She was then subpoenaed by an individual who had been criminally charged with abusing the dog.

[¶ 33] Ressler received notice requesting that she appear at a hearing before the Humane Society's Board of Directors to tell them what she would testify to at the criminal trial scheduled for five days later. The notice expressly stated "[t]he outcome of the hearing will affect the status of your employment with the Grand Forks Humane Society." *Ressler*, 480 N.W.2d at 429. There was evidence that after Ressler told the Board she had concluded there were no obvious signs of abuse of the dog, one of the Board members told her, "You can't go to Court and state those things," and "You'll ruin the whole States Attorney's case." *Id.* Six days later the Board met again and decided to fire Ressler. We concluded that these facts raised an inference that Ressler had been terminated for obeying the subpoena:

> The Board concedes that it was concerned with the public perception of a Humane Society employee appearing at a criminal trial and testifying on behalf of an individual charged with animal abuse. The Humane Society could have prevented an employee from initially examining an animal in relation to a criminal investigation. Instead, the Humane Society, through Toay, specifically asked Ressler to examine the dog and thus generated the possibility that Ressler would be subpoenaed. After Ressler examined the dog and concluded that there were no obvious signs of abuse, the Board asked her to appear at an October 18 hearing to "state precisely" what her testimony would be in the animal abuse case. The notice of hearing informed Ressler that the outcome of the hearing would affect the status of her

---

1. This is not the only instance in this case where Anderson's brief made a factual statement with a citation to a portion of the record which, upon examination, did not support the factual assertion made. Rather, Anderson's brief includes numerous citations to the record which do not, directly or indirectly, support the statement in the brief. Anderson's brief also contained citations to caselaw which did not support the proposition cited.

employment. According to Ressler, at that hearing Bichler, a Board member, told her that "You can't go to Court and state those things" and "You'll ruin the whole States Attorney's case." ... This factual scenario, including the timing of the discharge, raises an inference that Ressler was discharged because she obeyed the subpoena after she had informed the Board what her testimony would have been at the criminal trial. The Humane Society's prior satisfactory employment performance appraisals of Ressler and a favorable letter of recommendation by Toay also raise an inference that the reasons for discharge were not those stated in the notification that Daria's employment was terminated but rather the subpoena episode. Viewing the evidence in the light most favorable to Ressler, there are inferences that she was discharged because she obeyed the subpoena and was prepared to testify contrary to the Humane Society's interest in the animal abuse case. We conclude that there are genuine issues of material fact about whether or not Ressler was discharged because she honored the subpoena and was willing to testify at the criminal trial. Accordingly, summary judgment was improperly granted.

*Id.* at 432–33.

[¶ 34] There were obviously stronger facts in *Ressler* from which a factfinder could draw an inference of a causal connection between the protected activity and the discharge. The close proximity of the activity and the firing, the notice indicating Ressler's employment status could be affected by the matters discussed at the hearing, and the Board member's alleged statement that Ressler "can't go to Court and say those things" clearly distinguish *Ressler* from this case.

[¶ 35] Anderson asks us, in effect, to draw an inference of causation from the mere fact she reported violations and was subsequently fired. While, in an appropriate situation, circumstantial evidence may provide an inference of causation, there must be something more than pure speculation or conjecture. The proximity in time between the protected activity and the discharge is particularly significant. *See, e.g., Ressler,* 480 N.W.2d at 433; *Potter v. Ernst & Young, LLP,* 622 N.W.2d 141, 145–46 (Minn.Ct.App.2001); 1 Lex K. Larson, *Unjust Dismissal* § 6.08 (2000). Anderson reported the suspected improper acts in January 1996, June 1996, and the summer of 1997. She was terminated on June 30, 1998, approximately a year after the last protected activity. The lengthy delay between her reports and her termination does not support an inference she was fired because of the protected activity.

[¶ 36] We also note that Anderson's complaints were not directed toward Borg, the person who ultimately fired her. When the "very person about whom [the employee] complained was instrumental in the decision to terminate [the employee]," there may be an inference the termination was related to the protected activity. *Potter,* 622 N.W.2d at 146. In this case, the person who was the subject of Anderson's complaints, the Fargo manager, had been forced to resign several months before Anderson's June 1998 termination and had nothing to do with that decision.

[¶ 37] The circumstantial evidence in this case is too tenuous to support an inference of a causal connection between Anderson's reports and her termination a year later. Because Anderson has failed to establish a genuine issue of material fact on an essential element of her claim, the trial court did not err in granting summary judgment dismissing her retaliatory discharge claim.

## VI

[¶ 38] We have reviewed the remaining arguments raised by Anderson and find them to be without merit. We affirm the summary judgment dismissing Anderson's claims.

[¶ 39] GERALD W. VANDE WALLE, C.J., and CAROL RONNING KAPSNER, MARY MUEHLEN MARING, and WILLIAM A. NEUMANN, JJ., concur.